IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE N.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 24 C 8025 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| LELAND DUDEK, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, almost five years ago in June 11, 2020, alleging she became disabled on March 16, 2019 (Administrative Record (R.) 239) due to "Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, Learning Disorder with Impairment in Reading, Learning Disorder with Impairment in Mathematics." (R. 265). Over the next four years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on September 4, 2024, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on October 31, 2024. [Dkt. #7]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: autism spectrum disorder; attention deficit hyperactivity disorder. (R. 36). The ALJ then determined that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 12.10and 12.11. (R. 36-37). The ALJ found that the plaintiff had moderate limitations in understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (R. 37).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform a full range of work at all exertional levels with the following limitations:

> she can understand and carry out instructions for simple and routine and repetitive, one- and two-step tasks; she can make simple decisions in an environment that is predictable and changes little day-to-day; she should not be assigned to tasks that require hourly production quotas or that require any more than incidental interaction with the public.

(R. 38). The ALJ summarized the plaintiff's testimony and reports from her relatives and found that the plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms", but that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 39). The ALJ then reviewed the medical record, including March 2019 and August 2023 neuropsychological evaluations, a September 2022 consultative examination, vocational services progress notes, and medical opinions. (R. 39-42). The ALJ felt that the state agency reviewing psychologists "had the best longitudinal

view of both the medical and vocational aspects of the claimant's functioning through the evidence in the record, are generally persuasive and have been incorporated into the residual functional capacity finding." (R. 42).

Next, the ALJ relied on the testimony of the vocational expert to find that the plaintiff could perform jobs that existed in significant numbers in the national economy. Examples of such jobs were: housekeeping cleaner (DOT # 323.687-014), an unskilled job performed at the medium exertional level, with approximately 120,000 jobs in the national economy; laundry laborer (DOT # 361.687-018), an unskilled job performed at the medium exertional level, with approximately 40,000 jobs in the national economy; and cleaner II (DOT # 919.687-014), an unskilled job (SVP 1) performed at the medium exertional level, with approximately 30,000 jobs in the national economy. (R. 43). Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 36).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

3

*Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build a "logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a

4

decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record."). *See* extended discussion in *Michael T. v. Dudek*, 2025 WL 1079257 (N.D.Ill. 2025).

      Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1,

2021). The result was similar in *Swiecichowski v. Dudek*, No. 22-2011, 2025 WL 952961 (7th Cir. Mar. 31, 2025), with two judges feeling the ALJ had not provided enough of a logical bridge, and one – along with the magistrate judge below, *Swiecichowski v. Kijakazi*, No. 21-CV-249-SCD, 2022 WL 2069251, at *6 (E.D. Wis. May 27, 2022) – being able to follow the ALJ's reasoning.

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*,

97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. May 31, 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"—an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). *See* discussion in *Michael T. v. Dudek*, 2025 WL 1079257 (N.D.Ill. 2025). In this instance, given the evidence, a bit more was required.

### III.

The plaintiff has a number of arguments for remanding the ALJ's decision denying her claim. First, she argues that the ALJ unreasonably highlighted her ability to perform part-time work at Goodwill to conclude she could perform full-time employment. Second, she contends that the ALJ failed to properly assess the opinions of treating psychologist, Dr. Kelly. Third, the plaintiff says the same holds true for the ALJ's treatment of the opinion from the plaintiff's primary care physician, Dr. Panzica. Fourth, the plaintiff argues that the ALJ's residual functional capacity assessment and hypothetical to the vocational expert failed to adequately account for her moderate limitation in concentration, persistence, or pace and her difficulty interacting with others. Fifth, the plaintiff contends that the ALJ improperly discounted the lay opinions of her family members. And, finally, the plaintiff submits that the ALJ performed no more than a perfunctory analysis of whether she met Listing 12.05. Any other arguments the plaintiff might have presented are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

### A.

As just discussed with reference to the varying views of ALJs' decisions in *Jarnutowski* and *Swiecichowski* ,"logical bridges" aren't one-size-fits-all. Each reviewer reviews the ALJ's decision de novo, and no reviewer is the same. In terms of what constitutes an adequate "logical bridge," some reviewers demand more explanation than others. And, similarly, every medical record is different, with some requiring more attention in terms of a "logical bridge" than others. *See* discussion in *Michael T. v. Dudek, supra.*

Records detailing psychological impairments – like the record here – present more difficult cases for review and "logical bridge" building. A great deal of the records in such cases consist of mini-mental status exams – the kind where a mental health care provider rattles off brief assessments of mood, affect, thought process, thought content, judgment, and insight. But the information such assessments provide can often be less than helpful in assessing an application for disability benefits. Does "depressed" mood or "flat" affect mean a person cannot work? Does a "normal" thought process mean they can? What about fair or poor judgment and insight? Mental health care providers' notes are simply not prepared with a view toward ALJs, magistrate judges, or appellate court judges. Mental healthcare professionals have other concerns on their minds when compiling notes on their patients' treatments other than how they will be received and viewed in a legal proceeding.

We noted earlier that the plaintiff thinks the ALJ gave short shrift to Dr. Panzica's opinion. Dr. Panzica completed a checklist form from the plaintiff's attorney indicating that plaintiff had marked or extreme limitations in a number of work-related abilities. (R. 665-660). But his records provide little insight into his conclusions. (R. 662-99). They fall in line with the kind of cursory, conclusory assessments we're talking about. It's not surprising – and not improper – that the ALJ found the doctor's opinion "[un]persuasive, given the absence of any objective findings in his

8

treatment notes that could support this degree of limitation." (R. 42). That was certainly a valid reason for disregarding Dr. Panzica's opinion. *Baptist v. Kijakazi*, 74 F.4th 437, 444 (7th Cir. 2023); *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021). The ALJ's treatment of Dr. Kelly's opinion, however, is another matter.

Another challenging aspect of mental or psychological impairment cases is the subjective nature of the medical evidence. There are no x-rays or MRIs for psychological impairments. Mental health assessments are based on the plaintiff's subjective complaints, *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019); *Knapp v. Berryhill*, 741 F. App'x 324, 328 (7th Cir. 2018); *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015), and thus are often viewed with a fair degree of skepticism when a plaintiff is alleging physical impairments. Disability claimants, like any other party in other kinds of cases, *see Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir. 2009)(Posner, J.); *FTC v. Advocate Healthcare Network*, 162 F.Supp.3d 666 (N.D.Ill. 2016); *Tellabs v. Fujitsu*, 283 F.R.D. 374 (N.D.Ill. 2012), often have an incentive to lie or exaggerate. *Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016); *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015); *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). In such instances, there is a long line of case law holding that an ALJ can properly reject a doctor's opinion if it is based on a plaintiff's subjective complaints. *Baptist*, 74 F.4th 437, 444 (7th Cir. 2023)("... where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it."); *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022)("... when a physician's opinion is based primarily upon a patient's subjective complaints, the ALJ may discount that opinion."); *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013)("The question of which physician's report to credit thus collapses into the credibility issue ...."); *Karr*, 989 F.3d at 512 ("... an ALJ does not owe any deference to the portion of a treating physician's opinion

9

based solely on the claimant's subjective complaints."); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) ("... subjective complaints are the opposite of objective medical evidence and, while relevant, do not compel the ALJ to accept [a treating medical provider's] assessment").

At times, then, it can seem that the law deems a psychologist to have insight far beyond that of a neurologist or an orthopaedic surgeon, or a cardiac specialist. But, not always. In *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019), for example, the Seventh Circuit found it appropriate for an ALJ to discount a mental health opinion when it was based on a plaintiff's subjective complaints. 923 F.3d at 478. In any event, a disability case based on mental impairments, because it is based on subjective allegations, presents both ALJs and reviewing courts with a difficult task.

**B.**

But, with this record, we have a bit more to go on then a therapist asking, "how are you doing", and a plaintiff answering, "I can't focus" or "I'm having trouble concentrating." On two separate occasions – first in March 2019 and again in August 2023– the plaintiff underwent extensive neuropsychological testing with Dr. Stephanie Kelly, Psy.D. On March 16, 2019, plaintiff's father took her for neuropsychological functioning evaluation, her first as an adult at age nineteen. She had been diagnosed with Asperger's Syndrome at age seven and was in a program at the local high school for adult and vocational skills. (R. 392). The session began with an initial assessment, with plaintiff's father doing most of the talking and providing background. Plaintiff did answer questions appropriately when asked and shared her experiences. The initial assessment supported additional exploration of possible Autism Spectrum Disorder and Specific Learning Disorders. (R. 393). Plaintiff then went through a battery of tests: Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV); Wide Range Achievement Test Fifth Edition (WRAT-5); IVA-2:

Integrated Visual and Auditory Continuous Performance Test; Autism Diagnostic Observation Schedule-Second Edition (ADOS-2); Conners' Adult ADHD Rating Scales Self-Report Long Version (CAARS-S:L); Conners' Adult ADHD Rating Scales Observer-Report Long Version (CAARS-O:L); Behavioral Rating Inventory of Executive Functioning (BRIEF)-Adult: Self & Informant Report; Social Responsiveness Scale-Second Edition-Adult (SRS-2-A): Self & Informant Report; Gilliam Autism Rating Scales-Third Edition (GARS-3); Sensory Profile: Adolescent/Adult Inventory for Client and Agency Planning (ICAP); Sentence Completion. (R. 393).

The March 2019 WAIS-IV testing showed plaintiff to be functioning at a borderline level in Perceptual Reasoning, Working Memory, Processing Speed, and Full Scale IQ. She was at a low average level in Verbal Comprehension and General Abilities. (R. 393). Wide Range Achievement results were average in spelling; low average in sentence comprehension, math calculation, and reading composite; and very low in word reading. Although she was nineteen years old, these scores placed her at the fifth to ninth grade levels. (R. 395). ADOS-2 testing placed her within the Autism Spectrum classification understanding. The plaintiff's answers were developmentally appropriate for a younger teenager. Most of her weaknesses were within the reciprocal social interaction domain. There was a lack of shared enjoyment in conversations, communication of emotions, and non-verbal congruent expressions to support her verbal responses. (R. 397). Data from the IVA-2 showed clinically significant impairments in visual attentions functioning and when responding to non-targets and inconsistent reaction times suggesting an Unspecified Attention Deficit Hyperactivity Disorder. (R. 402).

Dr. Kelly said that plaintiff's pattern of cognitive and achievement weaknesses – especially borderline working memory and processing speed – would likely impact the breadth of opportunities

11

available for self-sustaining employment. (R. 402). Plaintiff's achievement scores in the WRAT-5 ranged from the fourth grade to ninth grade level of instruction. She had significant weaknesses in skills that are heavily dependent for task completion. (R. 402). Dr. Kelly strongly encouraged applying for Social Security Disability/Income given plaintiff's significant challenges in social responsiveness, executive functioning, sustained visual attention, working memory, processing speed, under-developed achievement abilities in reading and math that are between the fourth and fifth grade level, and cognitive scores ranging from borderline to low average abilities. All of these meant plaintiff would require considerable accommodations and modifications in the work environment that very few full-time, sustainable employment opportunities afford. (R. 403).

Four years later, on August 23, 2023, the plaintiff's family sought out Dr. Kelly again. (R. 700). The session was similar in extent and thoroughness as the previous one. Dr. Kelly again conducted an array of tests: Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV); Wide Range Achievement Test-Fifth Edition (WRAT-5); IVA-2: Integrated Visual and Auditory Continuous Performance Test; Wide Range Assessment of Memory and Learning-Third Edition (WRAML-3); Conners' Adult ADHD Rating Scales Self-Report Long Version (CAARS-S:L); Behavioral Rating Inventory of Executive Functioning-Adult Social Responsiveness Scale-Second Edition-Adult (SRS-2-A): Self & Informant Report; Sensory Processing Measure-Second Edition (SPM-2): Self & Informant Report; Beck Anxiety Inventory (BAI); Beck Depression Inventory-Second Edition (BDI-2); Vineland-3: Adaptive Behavior Scales-Third Edition. (R. 701). During this round of testing, the plaintiff was noted to have a blunt affect, work at a slow pace, and to be fatigued. (R, 701-02).

The August 2023 WAIS-IV testing showed plaintiff to still be functioning at a borderline level in Perceptual Reasoning, Working Memory, Processing Speed, and Full Scale IQ. She remained at a low average level in Verbal Comprehension and General Abilities. (R. 702). WRAML-3 testing showed plaintiff to be impaired in terms of attention and concentration, functioning in the bottom one percent. (R. 703). Wide Range Achievement scores were low average in reading, and sentence comprehension; and extremely low in math calculation. Plaintiff's scores placed her at the third to eighth grade levels. (R. 705). During the IAV-2 test, the plaintiff responded d to a number of auditory non-targets which she was instructed to refrain from, but performed within average limits across visual domains for response control. She was able to respond to targets reliably, but her reaction times were longer than those of her peers placing her in a mildly impaired category. (R. 705). SRS-2: Self & Informant Reports depicted moderate to severe difficulties across social awareness, social cognition, social communication, and social communication. (R. 707). Reports also indicated she had moderate to severe difficulties with sensory processing. (R. 708).

Plaintiff's Vineland-3 profile revealed her adaptive functioning skills to be much lower than her same-age peers. She struggled with communication and daily living skills, interpersonal relationships, and age-appropriate level of play and leisure. She did seem to have adequate coping abilities. (R. 709). Given plaintiff's clinically significant challenges in social responsiveness, working memory, and processing speed these results, Dr. Kelly strongly encouraged that she apply for SSI, with the assistance of her family. The doctor felt that "[t]he constellation of weaknesses will require [her] to have considerable accommodations and modifications in the work environment that very few full-time, sustainable employment opportunities afford. (R. 712).

On October 4, 2023, Dr. Kelly filled out a checklist from plaintiff's attorney. She indicated that the plaintiff was markedly limited in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting, or maintaining pace; and in adapting or managing oneself. (R. 720). She said plaintiff would likely be off task a quarter of the time. (R.720). She also assessed plaintiff as unable to perform at a satisfactorily level in a number of work-related areas, including: remembering work-like procedures; understanding and remembering very short and simple instructions; maintaining attention for two hour segments; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. (R. 719). Dr. Kelly indicated her assessments were based on her testing sessions, and that she had reviewed other medical records as well. (R.715, 721).

Obviously, in terms of support from clinical notes, there is a world of difference between Dr. Panzica's opinion and Dr. Kelly's. Nevertheless, the ALJ rejected not only Dr. Kelly's opinion (R. 41-42), but the test results as well. (R. 39-40). Instead, the ALJ favored the assessments from the state agency reviewing psychologists, essentially because of what the ALJ described as "longitudinal view." (R. 40, 42). That phrase generally means "involving the repeated observation or examination of a set of subjects over time with respect to one or more study variables." *Swiecichowski*, 2025 WL 952961, at *5 (citing Merriam-Webster's Collegiate Dictionary 734 (11th ed. 2020)). Obviously, the

14

reviewing psychologists never observed or examined the plaintiff, and Dr. Kelly tested her in multiple areas on two occasions. So, by "longitudinal view" in this instance, the ALJ means the fact that they reviewed the record, although they did not review Dr. Kelly's August 2023 testing session, or her opinion, or Dr. Panzica's opinion.

The reviewing psychologists did have the results from Dr. Kelly's March 2019 testing session, but, in referencing that session, they reduced the lengthy report and battery of tests to this:

> 3/16/2019-neuropsych eval: Claimant 19 years old. WAIS IV scores: VC: 89; PR: 79; WM: 74; PS: 76; FS: 81 DX: Autism Spectrum Disorder (with mild intellectual impairment/without speech impairment; Unspecified ADHD, Specific Learning Disorder with impairment in reading and mathematics.

(R. 123, 136, 137). Obviously, there was far more to it than just the WAIS IV scores, including scores and results that are relevant to being able to work through an entire eight-hour day over and over. Conversely, the state agency reviewers summarized the consultative exam at some length (R. 122), as did the ALJ. (R. 40-41). Again, one has to wonder about the ALJ's preference for a "longitudinal view" because the consultative examiner spoke with plaintiff on a single occasion for thirty minutes (R. 623), while Dr. Kelly, of course, spent two days with plaintiff. By way of comparison to the consultative exam, just one of the many tests administered in those two sessions, the WRAML-3, took nearly as much time – twenty minutes (R. 101) – as the entire consultative exam. So, it has to be said that the "longitudinal view" plank of the ALJ's "logical bridge" is missing.

And, of course, there is a qualitative difference between the consultative examiners observations over the course of a single brief session, and the results of Dr. Kelly's testing sessions. Yet, the ALJ, in part, questioned Dr. Kelly's assessment because "she did not have the opportunity

15

to review the other evidence regarding the [plaintiff's] functioning, such as the consultative examination where she completed serial subtraction, spelling a word backwards, completing a digit span, and followed simple directives successfully." (R. 42). Again, there is a "logical bridge" problem here. Being asked to spell a single word like "world" backwards pales in comparison to the sophisticated testing Dr. Kelly conducted. Those test results, especially the twenty-minute WRAML-3, raised significant concerns for working memory. By comparison, the consultative examiner asked plaintiff to remember three things – pen, apple, watch – and she could only recall two. (R. 624). As for "follow[ing] simple directives successfully," the consultative examiner asked the plaintiff to close her eyes. Does this kind of "assessment" really trump the extensive and thorough testing Dr. Kelly performed? To ask the question is to answer it. There is no "logical bridge" and certainly not one identified by the ALJ to demonstrate why she thought otherwise.

So, this case has to be remanded. Overall, it has to be said that the ALJ gave Dr. Kelly's testing results and her opinion short shrift. Based on her opinion, it appears she either didn't realize or take note of how extensive the testing was, or that it was a far better gauge of a capacity to work through entire days than asking someone to close their eyes was. That's important because in addition to her other significant issues, the plaintiff has a significant challenge in terms of mental stamina. Moreover, a couple of the ALJ's comments suggest that she may not have had a sense of what went on those two days. For example, in critiquing the March 2019 session, the ALJ notes that it was a re-evaluation but "the earlier evaluation from a Dr. Kasprzyk does not appear in the record." (R. 40). There is nothing in the report to suggest that Dr. Kasprzyk performed a previous battery of tests. Instead, the report indicates that Dr. Kasprzyk conducted an initial evaluation prior to the testing that day (R. 392), and that "initial assessment supported additional exploration of possible

16

Autism Spectrum Disorder and Specific Learning Disorders." (R. 393). It was during that pre-testing evaluation, or interview, that plaintiff's father "did most of the talking", not during the entire day of testing. (R. 393).

By remanding this case, we are not saying the ALJ's final result was wrong. This may be a case where the plaintiff should "give work a shot" – outside the confines of Goodwill – and if it proves too much for her, reapply for benefits. *Albert v. Kijakazi*, 34 F.4th 611, 617 (7th Cir. 2022). But, an ALJ cannot simply ignore a line of evidence that supports a finding of disability. *Combs v. Kijakazi*, 69 F.4th 428, 435 (7th Cir. 2023); *Grotts*, 27 F.4th at 1278; *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). While the ALJ did not ignore Dr. Kelly's two testing session reports nor her opinion, it is apparent from how the ALJ wrote about them, and the reasons the ALJ gave for disfavoring them and favoring other reports, that she did not get the gist of them. Her explanation for why she did not think much of them leaves a lot to be desired in terms of a "logical bridge." Even in the days before *Sarchet* and "logical bridges" – days the Seventh Circuit has seemingly harkened back to in cases like *Warnell* and *Morales* – "a minimal level of articulation of the ALJ's assessment of the evidence [wa]s required in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. Obviously, especially as against an examination like "close your eyes," two days' worth of testing is 'considerable evidence" and there needed to be more of a "logical bridge" as to why it was rejected.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to remand the ALJ's decision [Dkt. #15] is granted, and the defendant's motion for summary judgment [Dkt. #18] is denied.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/11/25